## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**BYRON LEWIS,**

     **Plaintiff,**

     **v.**

                         **Case No. 15-7339-JAR-JPO**

**FRITO-LAY, INCORPORATED, AND GREG HENAULT,**

     **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff Byron Lewis brings this action against Defendants Frito-Lay, Inc. ("Frito-Lay"), and Greg Henault, alleging claims of race discrimination under 42 U.S.C. § 1981.  Plaintiff claims that Defendant Frito-Lay discriminated against him on account of race when it terminated him rather than entering into a Last Chance Agreement, and that Defendant Henault discriminated against him when Henault denied Plaintiff the opportunity to repeat a step of discipline.  This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 56).  The motion is fully briefed and the Court is prepared to rule.  For the reasons stated in detail below, the Court grants Defendants' motion.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1]  In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine [dispute] of material

---

[1] Fed. R. Civ. P. 56(a).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[7]

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the

---

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

nonmovant."[10]  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[12]

## II.   UNCONTROVERTED FACTS

The following material facts are uncontroverted, stipulated to for the purposes of summary judgment, or viewed in the light most favorable to Plaintiff.

### *Plaintiff's Background and Supervisors*

Plaintiff is an African-American man who began his employment with Frito-Lay in 1991 as a packer at Frito-Lay's manufacturing plant in Topeka, Kansas.  Plaintiff remained in this position until his termination on July 31, 2012.  Frito-Lay manufactures and distributes snack foods throughout the United States.  As a packer, Plaintiff worked on a "manual line" in which bags of product would come down a line already packed and it was his responsibility to take the individual bags and pack them into cartons.  Upon being hired, Plaintiff became a dues-paying member of the Bakery, Confectionary, Tobacco Workers & Grain Millers International Union of America, Local 218, AFL-CIO (the "Union").  Mark McCarter is also a member of the Union, and at all times relevant to this case served as its business representative.  The business representative is an elected position and is essentially the Union "boss."

At all times relevant to this case, Plaintiff's immediate supervisor was Greg Henault. Henault supervised both the processing—where the products are made—and the packaging

---

[10] *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[11] *Adler*, 144 at 671.

[12] *Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

areas—where the product is packaged.  Henault reported to Bryan Sowers, who was the corn

business leader at the time of the allegations in this case.  Sowers reported to Scott Denny, who

was the manufacturing director at the Topeka plant at the time.

### *Frito-Lay Rules, Policies, and Procedures*

Frito-Lay has adopted the Global Anti-Harassment/Discrimination Policy of its parent

company, PepsiCo, which prohibits discrimination, unprofessional behavior and inappropriate

language.  The Policy requires employees to immediately report any discrimination or

harassment to their supervisor or to the Human Resources department.  Frito-Lay has an open-

door policy, and if an employee has a concern, they can go to their supervisor or directly contact

Human Resources.  Frito-Lay also has a Speak Up Line in which employees can anonymously

report conduct that violates the Anti-Harassment/Discrimination Policy by calling a toll-free

number or filing a complaint via the Speak Up Webline.

Additionally, at its Topeka plant, Frito-Lay has implemented the Topeka Plant Work

Rules ("Work Rules"), which are designed to "define and protect the rights, safety and welfare of

all employees" and to detail "appropriate guidelines for addressing inappropriate conduct."  The

Work Rules are divided into two sections.  The first section sets forth examples of behavior for

which an employee can be disciplined up to termination.  Examples include the unauthorized use

of a telephone, failure to comply with work rules given by a supervisor, participation in non-

work related activities during scheduled work hours, providing substandard work, and reporting

to work late.  The second section provides examples of rule violations that could result in

immediate separation from the company.  Examples under the second section include the use of

threatening, abusive, or indecent language or gestures toward another employee.  If an employee

violates the second section of the Work Rules, management can skip the four-step progressive discipline procedure explained below and go straight to termination.

At the Topeka plant, management employs a four-step progressive discipline policy to respond to violations of the Work Rules.  Discipline under the policy proceeds according to the following four steps: (1) verbal warning, (2) written warning, (3) suspension, and (4) termination.  This policy is not in writing, and Greg Henault did not receive training from Frito-Lay on how to apply the four-step process.  However, Plaintiff was aware of this progressive discipline policy while working at Frito-Lay.

Throughout his career at Frito-Lay, Plaintiff received training regarding the company's anti-discrimination policies, and he understood that these policies prohibited discrimination and retaliation.  Additionally, Plaintiff attended training sessions regarding the company's anti-harassment policy and Code of Conduct.  During these training sessions, the company spoke of its commitment to providing an environment free from discrimination and harassment, and explained that a 24-hour anonymous hotline existed to report harassment.  The company also explained five different entities to which employees could report harassment.  Although these training sessions were interactive and employees asked questions, Plaintiff did not ask questions because the information was clear to him.  Additionally, Plaintiff did not report harassment to any of the entities described in the training sessions.  In 2013, Plaintiff signed a form acknowledging that he reviewed and agreed to comply with the Work Rules.

### *Collective Bargaining Agreement and Grievance Procedure*

Plaintiff's Union and Frito-Lay entered into a collective bargaining agreement ("CBA") that controlled the terms and conditions of Plaintiff's employment.  Article 3 of the CBA provides that race discrimination is strictly prohibited in the workplace.  Article 5 of the CBA

provides that Frito-Lay may make rules and regulations that it deems best for the purpose of maintaining order, safety, and effective operations. By virtue of Article 9 of the CBA, the company has agreed to maintain a safe environment and to produce products that are safe and in compliance with rules and regulations of the agencies responsible for oversight.  Pursuant to the CBA, if Frito-Lay believes that a Union employee has violated or otherwise abused a workplace rule, that employee will be subject to disciplinary action.

The CBA also includes a three-step grievance process, and a Union employee may file a grievance any time the company disciplines the employee.  At the first step of the process, the employee or a Union steward completes a complaint form and submits the form to the employee's immediate supervisor for review.  If the grievance is not resolved at the first step, it proceeds to the second step.  At the second step, the business unit leader, or his or her representative, reviews the allegations.  If the grievance is not resolved at the second step, it progresses to the third step of the process, at which time the plant director hears the dispute.  If an employee is terminated, the first and second steps of the grievance process are skipped, and the issue proceeds directly to the third step.  If the dispute is not resolved through the grievance procedure, the employee may seek to arbitrate the matter through the Union.  After an employee's grievance is denied at the third step, the employee is invited to the Union's Executive Board, which is comprised of twelve members who vote whether to take the employee's case to arbitration.  Frito-Lay does not play a part in whether the Union will take a case to arbitration.

### *Repeat Steps of Discipline and Last Chance Agreements*

In some circumstances, employees at the Topeka plant who face discipline may be subject to one of two procedures that allow an employee to avoid the otherwise applicable

consequence on Frito-Lay's four-step progressive discipline policy.  The first procedure allows an employee to "repeat a step of discipline."  Under this procedure, an employee receives the same level of discipline that he or she received for a previous Work Rule violation, rather than moving to the next step of the progressive discipline policy. Whether an employee may repeat a step of discipline depends on the case and which rule is violated.

Although Henault had authority to unilaterally impose a step of discipline on an employee, it is unclear whether Henault could unilaterally allow an employee to repeat a step of discipline.  Henault testified in his deposition that he did not have the authority to allow an employee to repeat a step of discipline, and Sowers testified that he and Henault would "discuss" before allowing an employee to repeat a step.  But Sowers also agreed in his deposition that employees in Henault's position "have the discretion to repeat a step for an employee."

The second procedure allows an employee who is otherwise subject to termination to enter into a Last Chance Agreement ("LCA").  A LCA allows an employee to remain employed with the company, but the employee agrees that in the event they are placed on any step of discipline within nine months, their employment will be terminated.  LCAs are not a required step of Frito-Lay's progressive discipline policy, and are not part of the collective bargaining agreement.  Each time an employee is terminated, Mark McCarter asks Frito-Lay for a LCA, and Denny denies the request.  The only time that the company enters into LCAs is when the Union files an arbitration claim or threatens arbitration.  Threatening arbitration means that the Union puts the employee on a list or otherwise informs Denny or the Human Resources department that it intends to take the dispute to arbitration.

*Plaintiff's Employment and Termination*

As a packer, Plaintiff's job responsibilities included inputting the correct information in a labeling machine and ensuring that the correct packing and expiration date labels were placed on the product.  The Packaging Machine Operator ("PMO") also shared the responsibility of inputting the correct information into the machine.  Ensuring that the correct dates (packaging and expiration) are placed on the product is a matter of customer safety, and it is a violation of Frito-Lay policies to fail to check the packing and expiration dates on the products.  During his career at Frito-Lay, Plaintiff received discipline on several occasions for Work Rule violations including failing to clock in and not placing the correct date on product bags.  Until the series of incidents beginning in 2011 that led to his termination, Plaintiff did not receive discipline beyond written warnings.

On December 22, 2011, Lucas Graber, Plaintiff's supervisor at the time, gave Plaintiff a verbal warning for talking on his cell phone while on the manual line, in violation of Work Rule No. 17.  This was the second time in less than sixteen months that Plaintiff was written up for violating this rule.  On February 23, 2012, Plaintiff was given a writing warning by his supervisor, Ryan McGivern, for parking in a "Car Pool Only" parking spot, in violation of Work Rule No. 10.

On March 30, 2012, Plaintiff learned that a hold had been placed on the product produced by the machine he was working on because the bags packaged through that machine had a bad backseal.  After learning of the hold, Plaintiff asked his then-supervisor, Greg Henault, what was going to happen, and Henault replied, "I will have to see where you are in the disciplinary steps." After this conversation, Henault and Sowers came back to talk to Plaintiff about the incident. Sowers told Plaintiff that he had also erroneously packed five bags in the carton, instead of four

bags as stated on the label.  Plaintiff replied that he had made a mistake.[13]  After speaking with Plaintiff and reviewing his disciplinary record, Sowers and Denny made the decision to suspend Plaintiff.  Henault was not involved in the decision to discipline or suspend Plaintiff.  Henault summoned Plaintiff to his office and informed Plaintiff that "I am suspending you for one day."  Henault then escorted Plaintiff out of the plant.  Henault sent a memo the same day to the Leadership Team and Human Resources informing them that Plaintiff had been suspended for a job performance issue.  Company documents indicate that Henault also reported Mike Phillips, a white male, on March 30, 2012, for the same incident.  Phillips was terminated as a result of his violation.  Plaintiff did not request to repeat a step of discipline in relation to this incident.

When Plaintiff reported to work on April 2, 2012, he received from Henault a document entitled "Employee Performance Contact," dated April 2, 2012.[14]  The document detailed the nature of the March 30, 2012, violation and informed Plaintiff that future job performance issues could result in further discipline up to and including termination.  Plaintiff was not asked to sign the document, and the document was not signed by any manager.  In his deposition, McCarter testified that the lack of signatures was "strange."

On or about June 3, 2012, Plaintiff had a loud confrontation with a female co-worker, Alissa Seal.  Employees reported that Plaintiff cursed during this confrontation, and at least three individuals reported that Plaintiff called Seal a "white bitch."  Plaintiff denies that he cursed or called Seal a "white bitch." [15]  During the confrontation, Plaintiff was angry, and he raised his

---

[13]Sowers testified in his deposition that Plaintiff responded during this conversation that he packed five bags in the carton because "they fit better."  Plaintiff states in his declaration that he did not state that he packed five bags because "they fit better," but rather, he did so because he made a mistake.

[14]Doc. 57-6 at 9.

[15]Plaintiff also cites his deposition testimony, in which he stated that two African-American employees corroborated his position that he did not use any profane language in his interaction with Seal.  Doc. 60 at 8. Additionally, Plaintiff states in his declaration that neither of these employees were interviewed during the investigation of the incident.  Because the out-of-court corroborations by these employees are being offered to prove

voice and moved close to Seal.  Plaintiff admitted in his deposition that this conduct was a violation of the Code of Conduct and the Work Rules.  As a result of the confrontation, Plaintiff was suspended for three days for a violation of the second set of the Work Rules.  Henault had no involvement in the investigation of the confrontation or the issuance of discipline for this incident.  As a result of this incident, Plaintiff was again warned that further Work Rule violations could lead to his termination.

On July 26, 2012, Plaintiff was working as a packer on Machine 36 in the plant.  Plaintiff set up the workstation, and got the correct date on the product case label.  The PMO started up the labeling machine, but did not have the correct date on the product bags.  Plaintiff failed to check the correct expiration dates on the bag and let the machine run for an hour before it was discovered that he had allowed the wrong dates on the individual bags of product.  As a result, a significant amount of product had to be put on hold.  Plaintiff's actions and those of the PMO in failing to input the correct date into the labeling machine were the cause of the hold, and this was a serious violation of the Work Rules.  Plaintiff admitted to Henault that he was responsible for the hold.  That same day, Henault sent a letter to Plaintiff's Union, Human Resources, and the Leadership Team, noting that Plaintiff had been suspended for a workplace performance issue.  Henault did not make the decision to suspend Plaintiff.  Based on Plaintiff's disciplinary history, Plaintiff's employment was terminated after this incident on July 31, 2012.  Denny made the decision to terminate Plaintiff after consulting with Sowers.  Denny based his decision to terminate Plaintiff, in part, on the fact that the company had already given Plaintiff a repeat suspension and he could not recall any other employee receiving two suspensions within a very

---

the truth of the matter asserted, the corroborations constitute hearsay, and the Court will not consider them as part of the summary judgment record.  *See* Fed. R. Evid. 801.  Additionally—and contrary to what he states in his declaration—Plaintiff testified in his deposition that he did not know who was interviewed as part of the investigation.  Doc. 57-1 at 38.

short time period and not being terminated.  Sowers prepared a letter informing Plaintiff of his termination and informed Plaintiff of his termination.  Henault was not involved in the decision to terminate Plaintiff.

Henault never used any derogatory terms or otherwise referred to Plaintiff by anything other than his name.  However, Plaintiff submits the declaration of Vandon Rias, an African-American male who was employed as a PMO at Frito-Lay from 1999 through 2001.  Rias declares that while he was employed at Frito-Lay, Henault often made racially charged comments to him, including that he "didn't think black people were smart enough to run a packing machine."[16]

### Post-Termination Grievance and Meeting with Union Executive Board

After he was terminated on July 31, 2012, Plaintiff began the grievance process outlined in the CBA and approached the Union about representing his grievance.  On August 4, 2012, Plaintiff and the Union filed a grievance requesting that he be put back to work.  The grievance letter did not mention discrimination or harassment, and did not mention Henault.   On August 15, 2012, Plaintiff, McCarter, and Denny met to discuss Plaintiff's grievance.  Henault took no part in this meeting.  During the meeting, Plaintiff told Denny his mind had not been on his work, and admitted that his work had been substandard.  Also at the meeting, McCarter asked Denny for a LCA on behalf of Plaintiff, as was his practice every time a Union employee was terminated.  On August 24, 2012, Denny denied Plaintiff's grievance, thereby also denying his request for a LCA.  This was done consistent with Denny's practice in granting LCAs only after

---

[16]Defendant objects to the admission of this testimony on the basis that it is hearsay.  However, under Fed. R. Evid. 801(d)(2), statements made by an opposing party and offered against that party do not qualify as hearsay. Here, Rias declares that Henault, a Defendant in this case, made this statement to him.  Therefore, the Court considers this statement because it constitutes a party admission rather than hearsay.

the completion of the grievance process in response to the Union informing Denny that it intended to take a dispute to arbitration.[17]

After being notified that he would not be reinstated with a LCA, Plaintiff met with the Executive Board of the Union in Kansas City.  During the meeting, Plaintiff read a letter that he drafted asking the Union leadership to take his case to arbitration.  Although Plaintiff's letter referred to several Frito-Lay employees who had been given LCAs, the letter did not refer to race or mention that his race was a factor in his termination.  In the letter, Plaintiff stated that he had not been performing to standard.  At the conclusion of the meeting, the Board declined to take Plaintiff's dispute to arbitration.

### Plaintiff's Charge of Discrimination

After meeting with the Union, Plaintiff filled out an intake questionnaire with the Equal Employment Opportunity Commission ("EEOC").  Plaintiff added a typed memo to the questionnaire, which identified white employees who he believed were similarly situated but treated better than he was.  This memo was the first time that Plaintiff explicitly memorialized his belief that his termination was based upon race.  On or about January 24, 2013, Plaintiff filed a charge of discrimination with the Kansas Human Rights Commission.

### Other Frito-Lay Employees

In his charge of discrimination with the EEOC, Plaintiff identified Chrisitina McComas, Mark Dugger, and five other white Frito-Lay employees who he believed were similarly situated

---

[17]Plaintiff contends that Denny sometimes entered into LCAs without facing the threat of arbitration.  For support, Plaintiff cites to the deposition testimony of Denny and McCarter, in which they both fail to recall some of the specific facts surrounding an LCA entered into in relation to another employee, Christina McComas, in 2011.  In particular, Plaintiff points to McCarter's deposition, in which he testified that he did not know whether the Union had filed an arbitration claim on McComas' behalf at the time the LCA was entered into and that he could not recall McComas coming before the Union's Executive Board and asking the board to arbitrate her termination.  Doc. 61, at 23.  Denny testified that the Union informed him in that case that it intended to arbitrate the dispute.  Although Denny and McCarter could not recall the specific circumstances surrounding McComas' termination, both Denny and McCarter testified that it was Denny's practice to enter into LCAs only after being notified that the Union intended to take the dispute to arbitration.  Therefore, the Court finds that this fact is uncontroverted.

to him and given LCAs on account of their race.  In this lawsuit, Plaintiff asserts that only McComas and Dugger were similarly situated employees.[18]

Christina McComas worked in several positions at Frito-Lay, including as a floater operator, a position different from that of Plaintiff.  According to company documents, McComas was terminated on January 21, 2011, for making racially charged comments about a co-worker.  McComas filed a grievance concerning her termination, and it is unclear if or when Denny denied McComas' grievance.  Thereafter, the Union informed Denny that it intended to take the dispute to arbitration, but Denny cannot recall who from the Union informed him of this.  After the Union informed Denny that it intended to take the dispute to arbitration, McComas was reinstated through a LCA on February 18, 2011.  While on the LCA, McComas committed another Work Rule violation and was terminated on April 25, 2011.  Plaintiff has no recollection of whether or not McComas was supervised by Henault, and Henault does not believe McComas was ever a member of the teams he led at Frito-Lay.

Mark Dugger, another Frito-Lay employee, progressed through the four-step disciplinary process from December 14, 2007, through June 12, 2008, and received two verbal warnings, a written warning, and a one-day suspension for various Work Rule violations.  On July 23, 2008, Sowers saw Dugger texting at Machine 48, and sent him home pending an investigation.  After the Union indicated that it was going to bring Dugger's termination dispute to arbitration, Denny approved a LCA for Dugger.  According to company documents, on January 24, 2012, Dugger violated the company's Attendance Control Policy and was terminated.  Henault never supervised Dugger during his career at Frito-Lay.

---

[18]Doc. 60 at 30 ("Here, a genuine issue exists as to whether Mr. Lewis was similarly situated to two other employees specifically in regard to the opportunity to enter into a Last Chance Agreement.  Those two employees are Christine McComas and Mark Dugger, who are both white.")

## III.    DISCUSSION

### A.    Count I—Discrimination Claim Against Frito-Lay

In Count I of his Complaint, Plaintiff alleges that Defendant Frito-Lay engaged in race

discrimination in violation of 42 U.S.C. § 1981 by terminating his employment rather than

entering into a LCA with him.  Defendant moves for summary judgment on the basis that

Plaintiff fails to identify similarly situated employees who were treated more favorably than him

or otherwise present circumstantial evidence of pretext.

"'Section 1981—which declares that all persons shall have the same right . . . to make

and enforce contracts . . . as is enjoyed by white citizens—prohibits . . . racial discrimination' in

the workplace."[19]  A plaintiff alleging race discrimination under § 1981 may prove intentional

discrimination either through direct statements indicating a discriminatory motivation or through

indirect or circumstantial evidence.[20]  Where, as here, a plaintiff relies on circumstantial

evidence to prove discriminatory termination, courts apply the familiar three-step burden-shifting

framework set forth in *McDonnell Douglas Corporation v. Green*.[21]  The Tenth Circuit has

described the framework as follows:

> *McDonnell Douglas* first requires the aggrieved employee to establish a prima
> facie case of prohibited employment action . . . .  If the employee makes a prima
> facie showing, the burden shifts to the defendant employer to state a legitimate,
> nondiscriminatory reason for its adverse employment action . . . .  If the employer
> meets this burden, then summary judgment is warranted unless the employee can
> show there is a genuine issue of material fact as to whether the proffered reasons
> are pretextual.[22]

---

[19]*Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013)).

[20]*Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1225 (10th Cir. 2000) (citing *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999)).

[21]*Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–07 (1973)); *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015).

[22]*Plotke*, 405 F.3d at 1099; *Kendrick*, 220 F.3d at 1226.

To establish a prima facie case of race discrimination, a plaintiff must show that (1) the plaintiff belongs to a protected class; (2) the plaintiff suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination, or the employer did not eliminate the plaintiff's position after his or her termination.[23]  Examples of circumstances that can give rise to an inference of discrimination include actions or remarks made by decision makers reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, or other evidence that the proffered justification for the adverse action is so weak, implausible, inconsistent, or incoherent that a reasonable factfinder could find it unworthy of belief.[24]  The prima facie case serves to eliminate the most common nondiscriminatory reasons for the plaintiff's adverse employment action, such as "lack of qualification" or "elimination of the job."[25]  A plaintiff's burden of establishing a prima facie case "is not onerous."[26]

Here, the Court assumes without deciding that Plaintiff has met the non-onerous burden of establishing a prima facie case of racial discrimination.  The burden therefore shifts to Defendant to articulate a nondiscriminatory purpose for the adverse employment action. Defendant has done so, stating that Plaintiff violated a series of Work Rules that resulted in termination under the company's progressive discipline policy.  Further, Plaintiff does not dispute that Defendant has met its burden under this prong of the *McDonnell Douglas* framework.[27]

---

[23]*E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007); *Didier v. Abbott Labs.*, 614 F. App'x 366, 374 (10th Cir. 2015) (stating that the third element of the prima facie case involves showing that employer did not eliminate position after termination) (citing *Kendrick*, 220 F.3d at 1228–29).

[24]*Luster v. Vilsack*, 667 F.3d 1089, 1095–96 (10th Cir. 2011); *Plotke*, 405 F.3d at 1101.

[25]*Id.*

[26]*Plotke*, 405 F.3d at 1099 (citing *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001)).

[27]Doc. 60 at 27.

The burden thus returns to Plaintiff to show by a preponderance of the evidence that the nondiscriminatory reasons offered are merely pretext.  Evidence of pretext may take a variety of forms, including evidence that:

> (1) the defendant's stated reason for the action is false; (2) the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; (3) the defendant has shifted rationales for the adverse employment action; or (4) the defendant has treated similarly situated employees who committed acts of comparable seriousness differently.[28]

Plaintiff argues that he has shown that Defendant's stated reasons for termination were pretextual by offering evidence of the following: (1) that similarly situated white employees were treated more favorably than him; (2) that Defendant Frito-Lay's proffered reasons for termination were so inconsistent or contradictory that they are unworthy of belief; and (3) that Defendant Frito-Lay made false statements about material facts regarding its procedures in entering into LCAs.  Defendant counters that Plaintiff's evidence does not give rise to an inference of pretext.  The Court will address each piece of evidence in turn.

### 1.    Similarly Situated Employees

Plaintiff first argues that two similarly situated white employees, Christina McComas and Mark Dugger, were treated more favorably than him in that they both received LCAs and he did not.[29]  One common method of showing pretext is by demonstrating that the employer treated similarly situated employees more favorably.[30]  "Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable

---

[28]*Didier*, 614 F. App'x at 374 (citing *Kendrick*, 220 F.3d at 1230).

[29]As explained above, Plaintiff previously identified five other employees in his EEOC Charge who he believed were similarly situated to him but treated more favorably, but in this case he claims that only McComas and Dugger were similarly situated.  *See supra*, Part II. at 12–13.

[30]*E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800–01 (10th Cir. 2007); *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007) (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)).

seriousness.'"[31]  If an employer's differential treatment of similarly-situated employees is "trivial or accidental or explained by a nondiscriminatory motive," such treatment is insufficient to create an inference of pretext.[32]

Defendant argues that Plaintiff is not similarly situated to McComas because she held different jobs and classifications, and was not supervised by Henault.  The Court agrees.  It is undisputed that McComas held different positions than Plaintiff and that she was not supervised by Henault.  Plaintiff attempts to demonstrate that he and McComas shared a common supervisor in Denny, because Denny made the decision whether or not to offer either of them a LCA.  However, the Tenth Circuit has indicated that employees who do not share the same immediate supervisor are not similarly situated.[33]  Here, Plaintiff's immediate supervisor was Henault, while McComas was never supervised by Henault.  Thus, because Plaintiff and McComas did not share the same supervisor or positions, the Court finds that a genuine dispute of fact exists as to whether they were similarly situated.

Defendant also argues that Plaintiff is not similarly situated to Mark Dugger because Dugger was not supervised by Henault and because Dugger's violations were not of comparable seriousness.  While the Court cannot find that Dugger's violations were less serious than those of Plaintiff, it is undisputed that Dugger was not supervised by Henault.  Thus, the Court finds that Plaintiff and Dugger are not similarly situated.  Even if Plaintiff was similarly situated to McComas or Dugger, the Court finds that the differential treatment is "explained by a nondiscriminatory motive," because the Union in both McComas' and Dugger's cases threatened arbitration, thereby motivating the company to enter into a LCA.  Therefore, the Court finds that

---

[31]*Id.* (citing *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006)).

[32]*Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007).

[33]*Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1233 (10th Cir. 2000).

Plaintiff has not presented evidence that gives rise to a genuine dispute of fact as to whether Frito-Lay treated similarly situated employees differently.

## 2.     Inconsistent Explanations

Plaintiff also argues that he has established pretext by showing that Defendant's proffered explanations for terminating him, rather than entering into a LCA, were so inconsistent and contradictory that they are not worthy of belief.  First, Plaintiff points to Denny's deposition testimony, wherein he states that the company entered into LCAs only after facing the threat of arbitration from the Union.  By contrast, the company in its response to the EEOC charge did not refer explicitly to the threat of arbitration, but instead stated that it enters into LCAs "where the Company views it as a preferable option to the uncertain outcome of an arbitration."  Thus, Plaintiff argues, Defendant made inconsistent statements as to the reasons why the company enters into LCAs.  The Court cannot find that these statements are contradictory, much less to an extent that a reasonable factfinder could rationally find Defendant's stated reasons for termination unworthy of credence.[34]  Although the EEOC response did not mention the threat of arbitration specifically, it did explain that the company enters into LCAs because they are more preferable to arbitration.  This statement is consistent with Denny's statement that the company enters into LCAs in response to the threat of arbitration.

Additionally, Plaintiff argues that Denny made inconsistent statements regarding when the company enters into LCAs.  In his deposition, Denny initially testified that the Union's request for a LCA "is part of the grievance procedure and my denial is a denial of that request."  Denny later testified that "I never granted [LCAs] . . . at this step," referring to the third step of

---

[34]*See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) ("A plaintiff demonstrates pretext by producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.") (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

the grievance process.  Denny further testified that the Union's threat of arbitration "would be done after I deny" the grievance and the LCA.  Plaintiff appears to contend that Denny's statement that the Union's request for a LCA "is part of the grievance procedure" contradicts his statement that the Union's threat of arbitration (and Denny's subsequent grant of a LCA) "would be done after" the grievance process.[35]  Again, the Court cannot find that these statements create a genuine dispute of fact as to whether Defendant gave inconsistent reasons for not entering into a LCA with Plaintiff.  Denny's testimony is clear that as part of the grievance process, the Union would request a LCA and Denny would deny it as a matter of course.  Only after Denny denied the grievance and the Union's LCA request would the Union threaten arbitration, thereby prompting Denny to negotiate a LCA.  Denny's testimony does not suggest that he sometimes entered into LCAs during the grievance process or without facing the threat of arbitration.  Therefore, the Court finds that Plaintiff has not presented evidence of inconsistent statements regarding the company's reasons for termination.

### 3.    False Explanations

Finally, Plaintiff argues that Defendant's false explanations as to material facts surrounding Plaintiff's termination establish pretext.  Like inconsistent explanations, false explanations regarding the employer's reasons for the adverse action can give rise to pretext.[36]  Here, Plaintiff points to Denny's testimony that the Union threatening arbitration meant that the Union "put the person on a list."[37]  Plaintiff asserts that this testimony is false in that it does not reflect the actual process of the Union threatening arbitration.  Plaintiff contends that the disciplinary documents related to McComas and Dugger did not reveal any list of cases to be

---

[35]*See* Doc. 60 at 31.

[36]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *Swackhammer*, 493 F.3d at 1169 (quoting *Reeves*, 530 U.S. at 148–49).

[37]Doc. 57-3 at 3.

arbitrated containing McComas or Dugger's names, and McCarter could not recall the Union Executive Board ever voting to proceed forward to arbitration on any complaint of McComas or Dugger.  As Defendant notes, however, in addition to testifying that threatening arbitration meant the Union "put the person on a list," Denny also testified that the Union could threaten arbitration by "simply just tell[ing] me or tell[ing] the HR department that they were going to bring arbitration—this case to arbitration."[38]  This testimony reveals that not all disputes that proceed to arbitration will appear "on a list."  It is undisputed that Denny testified that the Union informed him in the cases of both McComas and Dugger that it intended to proceed to arbitration.  The absence of a list in the cases of McComas and Dugger does not create a genuine dispute of fact as to whether Denny's statement regarding the process of the Union threatening arbitration was false.

Plaintiff also argues that Denny's inability to remember who specifically from the Union threatened arbitration in the disputes involving McComas and Dugger indicates that Denny's statement that the Union threatened arbitration is false.  The inability of Denny to remember the specifics of the LCAs entered into in those disputes, which concluded years before his deposition in this case,[39] does not create a factual dispute as to whether his statements regarding the threats of arbitration were false.  Therefore, the Court cannot find that Plaintiff has identified false explanations by Defendant regarding its reasons for denying a LCA in this case.

As explained above, Plaintiff has not identified non-protected employees who were similarly situated to him and treated more favorably.  Plaintiff also has not come forward with evidence showing that Defendant Frito-Lay has advanced inconsistent explanations for its

---

[38]*Id.*

[39]Denny was deposed on November 12, 2015.  Doc. 57-3 at 1.  Defendant Frito-Lay entered into LCAs with McComas and Dugger in 2011 and 2008, respectively.

decision not to enter into a LCA with Plaintiff.   Finally, Plaintiff has not offered evidence demonstrating that Defendant Frito-Lay's stated reasons for its decision regarding the LCA are false.  Accordingly, because Plaintiff has not presented evidence creating a genuine dispute of fact as to whether Defendant Frito-Lay's explanations were pretextual, the Court finds that Defendant is entitled to summary judgment on Count I.

### B.      Count II—Discrimination Claim Against Greg Henault

Plaintiff alleges that Defendant Greg Henault engaged in race discrimination in violation of § 1981 by not allowing him to repeat a step of discipline in response to the incident on March 30, 2012, when Plaintiff received a one-day suspension for packing bags of product with a weak seal and placing too many bags into a carton.  Defendant moves for summary judgment on the basis that Plaintiff has not shown that he was denied the opportunity to repeat a step of discipline on account of race, and that Plaintiff in fact was given the opportunity to repeat a step of discipline in connection with another violation of Work Rules.[40]  Plaintiff responds by identifying four categories of circumstantial evidence that he contends establish an inference of discrimination and pretext.

At the outset, the Court notes that Plaintiff's Count II discrimination claim is governed by the same *McDonnell Douglas* framework as applied to Count I.[41]  As with Count I, the Court assumes without deciding that Plaintiff has met the non-onerous burden of establishing a prima facie case of discrimination under Count II.  Further, the Court finds that Defendant Henault has met his burden in setting forth a legitimate non-discriminatory reason for denying a repeat step of discipline—that is, Plaintiff repeatedly violated Work Rules and, as a result, was disciplined

---

[40]Plaintiff received a suspension for the June 3, 2012, confrontation with Seal, after having previously received a suspension for the March 30, 2012, incident.

[41]*See supra*, Part II.A.; *Jones v. Denver Post Corp.*, 203 F.3d 748, 755–56 (10th Cir. 2000) (applying *McDonnell Douglas* framework to discrimination claim alleging disparate discipline).

five times.[42]  Thus, the Court turns to whether the four categories of circumstantial evidence that Plaintiff identifies give rise to a genuine dispute of fact regarding pretext.

### 1.      Discriminatory Animus or Prejudice

Plaintiff argues that the declaration of Vandon Rias, a former African-American employee of Frito-Lay, indicates that Henault harbored discriminatory animus or prejudice toward African-Americans.  In his declaration, Rias states that while he worked at Frito-Lay from 1999 through May of 2001, Henault "often made racially derogatory comments" to him, including that "he didn't think black people were smart enough to run a packing machine."[43] These comments fail to establish pretext for a number of reasons.  First, "'isolated racial comments' are insufficient to establish pretext unless they 'can somehow be tied to the employment actions disputed in the case at hand.'"[44]  A plaintiff must show that the comments were "directed at the plaintiff, her position, or the employer's policy which led to the disputed employment decision."[45]  The comments Rias refers to in his declaration were not directed at Plaintiff or his position, and it is undisputed that the comments were not tied to the disciplinary decision in this case.  Second, Rias does not contend that Henault ever supervised him or that the comments were connected in some way to a disciplinary matter that Henault oversaw.[46]  Finally, "the passage of time can also render a comment too remote to support a finding of pretext."[47]  At

---

[42]*See* Doc. 60 at 27–28 (Plaintiff conceding that Defendant has met his burden under second step of *McDonnell Douglas* framework).

[43]Doc. 61 at 5.

[44]*E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 489 (10th Cir. 2006) (quoting *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1289 (10th Cir. 2000)); *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1212–13 (10th Cir. 2010) (quoting *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006)).

[45]*Stover v. Martinez*, 382 F.3d 1064, 1077–78 (10th Cir. 2004) (citing *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994)); *Johnson*, 594 F.3d at 1213.

[46]*BCI*, 450 F.3d at 489 (finding pretext established based on showing of racial comments to other employees under common manager's supervision, thus showing pattern of racial bias in disciplinary matters).

least ten years passed between the comments to Rias and the denial of a repeat step of discipline to Plaintiff in 2012.  Therefore, the declaration of Vendon Rias does not create a genuine dispute of fact as to pretext.

### 2.  Disturbing Procedural Irregularities

Second, Plaintiff contends that the absence of his or any manager's signatures on the April 2, 2012, Employee Performance Contact indicates a deviation from normal company procedure, thereby establishing pretext.  In his deposition, McCarter testified that the lack of signatures was "strange."  Evidence of pretext may include deviations from normal company procedure and "disturbing procedural irregularities," such as falsifying or manipulating employment criteria.[48]  Plaintiff cites three Tenth Circuit cases in which the court found that the plaintiffs established pretext in part based on showings of disturbing procedural irregularities.[49] In *Doebele v. Sprint/United Management Co.*, the plaintiff provided evidence that the written warning she received was not documented for many weeks, and the employer's equal opportunity officer testified that she believed the eventual documentation "was created in an attempt to justify a decision already made."[50]  In *Garrett v. Hewlett-Packard Co.*, the plaintiff presented "expert opinion that HP's [ranking and evaluation] system is disturbingly lacking in objective standards, means of guidance for poorly evaluated and ranked workers, and oversight by HP executives."[51]  In *Trujillo v. PacifiCorp*, the employer relied in part on time sheet and clock-out records to justify its termination decision, despite managers, supervisors and

---

[47]*Wagoner v. Pfizer, Inc.*, 391 F. App'x 701, 708 (10th Cir. 2001); *Antonio*, 458 F.3d at 1184 (10th Cir. 2006) (holding a comment made nine months before termination too remote to establish retaliatory motive).

[48]*Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) (citing *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)).

[49]Doc. 60 at 25.

[50]342 F.3d 1117, 1138–39 (10th Cir. 2003).

[51]305 F.3d 1210 (10th Cir. 2002).

employees in the company testifying that the procedures for time sheets and clocking out were not followed.[52]

This case does not involve the type of disturbing procedural irregularities described above.  Here, the Employee Performance Contact was dated the day after Plaintiff returned from his suspension for the March 30 incident.[53]  The Contact described the events leading to the violation, and Plaintiff agreed in his deposition that he committed the Work Violations as described.[54]  Unlike in *Doebele*, here there is no indication that Henault prepared the Contact to justify a decision already made.  Further, Plaintiff has not pointed to a company policy requiring Employee Performance Contacts be signed.  Even if McCarter's testimony that the lack of a signature was "strange" indicates an irregularity, it does not indicate a disturbing procedural irregularity suggesting that Henault "acted with an ulterior motive."[55]  Without more, the Court cannot find that the absence of signatures creates a genuine dispute of fact as to pretext.

### 3.    Subjective Criteria

Plaintiff also asserts that the use of subjective criteria establishes evidence of pretext. The Tenth Circuit has repeatedly explained that evidence of pretext includes the employer's use of subjective criteria in employment decisions, and courts are to view subjective evaluation methods "with skepticism."[56]  In *Garrett*, the Tenth Circuit held that the plaintiff met his burden of demonstrating pretext by presenting evidence of the employer's "wholly subjective" ranking and evaluation system.[57]  Here, Plaintiff contends that the process of granting repeat steps of

---

[52]524 F.3d 1149, 1159 (10th Cir. 2008).

[53]Doc. 57-6 at 9.

[54]Doc. 57-1 at 39.

[55]*See Doebele*, 342 F.3d at 1138.

[56]*Garrett*, 305 F.3d at 1218; *Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005).

[57]*Garrett*, 305 F.3d at 1218.

discipline was wholly subjective because (1) there were no policies or guidelines in writing that explained how to apply the Work Rules; (2) Henault never received training from the company on how to apply the four-step progressive disciplinary process; and (3) Sowers testified that "[r]epeat steps depend on the case."  Although the progressive discipline policy was not in writing and Henault did not receive training specific to the policy, this does not indicate that the process of granting repeat steps of discipline was wholly subjective.  Furthermore, as Defendant notes, Sowers' full statement in his deposition was that "[r]epeat steps depend on the case *and what work rule was violated*."[58]  Sowers also identified a number of factors that affect the decision to grant a repeat step of discipline.[59]  Thus, the Court cannot find on the record before it that a genuine dispute of fact exists as to whether the repeat step of discipline process was wholly subjective.

### 4.    False Explanations

Finally, Plaintiff argues that two pieces of evidence suggest that Defendant Henault's "stated reason for the adverse employment action was false."[60]  As the Supreme Court stated in *Reeves v. Sanderson Plumbing Products, Inc.*, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."[61]  Plaintiff first points to Henault's testimony that he did not have the authority to allow an employee to repeat a step of discipline. By contrast, Sowers agreed in his deposition that employees in Henault's position "have the discretion to repeat a step for an employee."  Thus, Plaintiff contends, Henault's statement that

---

[58]Doc. 57-3 at 18 (emphasis added).

[59]*Id.* at 17.

[60]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 12220, 1230 (10th Cir. 2000).

[61]530 U.S. 133, 147 (2000).

he did not have the authority to allow a repeat step of discipline was false.  As Defendant notes, however, Sowers also testified that his managers were required to discuss with him "before repeating a step of discipline."  Based on the foregoing, it is unclear whether Henault had the authority to allow employees to repeat steps of discipline.  Even assuming that Henault's testimony was false, the testimony relates to who had the authority to allow Plaintiff to repeat a step of discipline, not whether the reasoning for denying the repeat step was legitimate.[62]  Thus, the Court cannot find that a genuine dispute of fact exists as to whether Henault's explanation for not allowing Plaintiff to repeat a step of discipline is unworthy of credence.

Second, Plaintiff argues that Sowers and Denny made false statements about whether Plaintiff admitted that he purposefully packed five bags into a carton instead of four on March 30, 2012.  Sowers testified in his deposition that Plaintiff stated that he thought five bags would "fit better."  Denny testified that he denied Plaintiff's termination grievance in part because Plaintiff admitted that he "purposefully" packed five bags rather than four on March 30, 2012. By contrast, Plaintiff maintains that he told Sowers and Henault on March 30, 2012, that he "made a mistake" by packing five bags instead of four.  Even if Sowers and Denny's accounts of the March 30 incident are false or inaccurate, these statements do not constitute false statements concerning the reason why Henault denied Plaintiff a repeat step of discipline.  Plaintiff's claim regarding the repeat step of discipline is against Henault, not Sowers or Denny.  Plaintiff does not claim that Henault made false statements regarding his reason for denying the repeat step of discipline.  Furthermore, Plaintiff's statement that he made a mistake does not negate the undisputed fact that his conduct on March 30 constituted a violation of the Work Rules.  Here, Defendant Henault has proffered a legitimate, non-discriminatory reason for denying Plaintiff a

---

[62]As explained above, Defendant Henault has met his burden of offering a legitimate non-discriminatory reason for denying a repeat step of discipline to Plaintiff.  *See* Part III. B., *supra*.

repeat step of discipline.  Sowers and Denny's statements do not create a genuine issue of fact as to whether this stated reason was pretextual.

The Court finds that Plaintiff has not provided sufficient evidence of bias or prejudice on the part of Greg Henault, disturbing procedural irregularities, use of subjective criteria, or false explanations to create a genuine dispute of material fact as to whether Defendant Henault's reason for not allowing Plaintiff to repeat a step of discipline were pretextual.  Furthermore, it is undisputed that after Plaintiff received a suspension for the March 30, 2012, incident, he received a repeat suspension for a confrontation with a fellow employee on June 3, 2012. Therefore, the Court grants summary judgment on Count II of Plaintiff's Complaint.

## III.    CONCLUSION

Because Plaintiff has not presented evidence sufficient to create a genuine dispute of fact as to whether Defendant Frito-Lay's reasons for denying Plaintiff a LCA were pretextual, the Court grants Defendants' motion for summary judgment on Count I.  Similarly, because Plaintiff has not presented evidence sufficient to create a genuine dispute of fact as to whether Defendant Henault's reasons for denying Plaintiff a repeat step of discipline were pretextual, the Court grants Defendants' motion for summary judgment on Count II.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 56) is **granted.**

**IT IS SO ORDERED.**

Dated: June 28, 2016

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

27